Peck, J.,
delivered the opinion of the Court.
This petition alleges that on the 5th day of March, 1860, the petitioner and one T. W. Taliafero proposed to the Secretary of War to furnish to the United States all the supplies that might be needed until the 26th day of March, 1862, whether in the commissary or quartermaster’s department, at all the military posts then, or which might thereafter be, established in that part of the Territory of Arizona which lies south of thirty-three degrees and thirty-six minutes north latitude, and west one hundred and six degrees and thirty-five minutes west longitude, at a compensation twelve per cent, less than was paid for similar articles the previous year to other contractors who had delivered supplies within the same limits, the transportation to be estimated from the nearest established posts.
That on the 9 th day of March following the Secretary of War .accepted this proposition, and ordered that the petitioner and Taliafero should furnish all the supplies, &c., until the 26th day of March, 1862, which might be needed at all the posts at the rate aforesaid; to which prices were to he added a reasonable allowance for transportation to *62 any new posts that 'might be established, estimating from the nearest posts then already established.
That Grant and Taliafero, acting upon this order, immediately set themselves about the performance of its requirements. That Taliafero soon after relinquished and assigned to Grant all his interest in the contract.
That afterwards, on the 9th day of September, 1SG0, Grant, as he avers, executed a written contract with Horace Randall, acting assistant commissary of subsistence, representing the United States, by which Grant bound himself to furnish to the United States, at the posts included within the terms of the order from the Secretary of War of the 9th of March, 1860, above referred to, all the supplies of fresh beef, bacon sides, hams, flour, beans, candles, and soap, which might be required at the price stated, viz: twelve per cent, less than the ruling prices of the previous year.
That on the 20th day of the same month he entered into a similar contract with Randall, as acting assistant quartermaster, as he avers, in conformity with the order made by the Secretary of War for supplies and transportation for the quartermaster’s department.
That acting upon the order of the Secretary of War of the 9th of March, 1860, Grant invested capital and obtained credit, and moved to Arizona and established an agency and depot at Tucson, in that Territory.
That in order to comply with the obligations imposed upon petitioner by virtue of said contracts large supplies were purchased in Boston and New York, which were shipped to Port Lavacca, in Texas, to be transported thence overland to Arizona, which were ready for shipment to Lavacca on the 24th of September, i860, of which the United States had notice; a,nd the petition avers that it was understood and agreed that such supplies were to be inspected by the United States before shipment, but that the United States failed to make inspection until the 6th of December following, to the great injury of the petitioner.
That in order to transport said supplies from Port Lavacca to certain military posts in Arizona, which were twelve hundred miles distant, it became necessary to purchase and have ready at Lavacca a large number of wagons, teams, servants, &c., which it is averred were there as early as the 10th of November, but owing to the delay in inspection of the supplies they did not reach Lavacca until the 10th of January, 1861, by reason of which the teams could only advance *63 a short distance, owing to the scarcity of food on the route and the severity of the weather at that season, and were detained in that vicinity until the spring; but if the supplies had been inspected sooner, they would have reached their destination prior to the 20th of April, 1861.
That the cost of the supplies and other goods purchased for the use. of claimant, including freight charges, the cost of teams, wagons, expenses, &c., amounted to $84,370 14 prior to the 20th of April, 1861, exclusive of the transportation, which it is alleged would of itself amount to $55,085.
That while said supplies and other goods were on their way from Lavacca to Arizona, at a point in Texas fifty miles west of San Antonio and nine hundred and fifty miles short of their destination, the whole property was captured by armed rebels, taken from the petitioner, and were lost to him, which capture it is alleged resulted from the delay of the government in furnishing an inspector, and not from any fault of the petitioner.
That while the petitioner was carrying out Iiis contracts, and was transporting supplies from Lavacca to Arizona,-the United States, without fault on the part of petitioner, and without notice to him, did, on the 3d day of April, 1861, revoke and annul the said contracts, by reason of which, petitioner says, he sustained actual damage, to the amount of $84,370 14. This sum, with so much profit as petitioner claims he might have made, which he states would have been $200,000, he now insists should be paid him as his damages for annulling the contracts.
That all this property which had been acquired under contract with the government, and for its use, having been captured by a public enemy while in transit, without the fault or negligence of the petitioner, he should be paid therefor, and also for the transportation, as if the whole had arrived at its original destination, which amount is stated at $139,455 14.
That the teams and property were actually employed in the service of the United States, and that petitioner never agreed to incur the risk of loss by capture, and that by force of the second section of the act of Congress approved March 3, 1849, entitled “An act to provide for the payment of horses and other property lost or destroyed in the military service of the United States,” he is entitled to be paid therefor.
That the first order from the Secretary of War, under date of March 9, 1860, was modified by a subsequent order of July 9, 1860, which *64 limited the supplies to be furnished, but that on the 18th.day of September, 1S80, the Secretary of War revoked the aforesaid order of the 9th of July, and required that such goods as should be purchased in 'the eastern cities should be inspected prior to their shipment.
It appears from the foregoing, which is a full statement of the case presented in the petition in various aspects, that the petitioner rests his claim upon two grounds, namely, for the capture and loss of his property, and for the rescission of the contract or authorization signed by Secretary Floyd, dated March 9, 1860.
In the argument we were urged by counsel to recognize the two contracts of the 9th and 20th of September, executed between Lieutenant Randall and claimant, as being in force. This we cannot do. These contracts were protested against by the claimant at the time of signing. The agent of the claimant, S. M. Thomson, also insisted that the order of the 9th of March ought to be enforced, as the only way by which Grant could be saved from ruinous loss. The Secretary of War repudiated the contracts because they were not in conformity with the original agreement between himself and the claimant and Taliafero; because they were not required or authorized by him; and because the original contract of the 9th of March having been concluded anterior to, could not be affected by the act of Congress of 23d June, 1860, which act prohibited the making of such contracts without asking publicly for proposals. There seemed to be not only an acquiescence on all sides in the rejection of the contracts with Lieutenant Randall, but a desire that they should be disregarded and revoked. But were we to adopt a different conclusion, these contracts would show that the supplies to be furnished were at the risk of claimant until after they should have been inspected and accepted in Arizona.
The claimant plants himself most strongly on the order of the 9 th of March, 1860, which, he says in his brief, was “ a contract as plain as ever was made,” complete in itself, and capable of fulfilment without further explanation or direction. Upon it alone he embarked, as he says, all his capital and credit, himself proceeding at once to Arizona to perform its obligation and to gather the fruits whieh he hoped would ripen to him therefrom. Accepting this as correct, what is the result 1
This contract did not require that the supplies to be furnished should be inspected, and any subsequent request or ■ direction in that regard was not obligatory upon the claimant; and if he foresaw that *65 injury to him. would result from his acquiescence in that request, he should have done with all the supplies as he did with a part of them, which was to purchase only such as were known to have been of good quality, and had them forwarded in seasonable time to have insured their safe arrival at their proper destination.
If his purchasing agents, as they say they did, forwarded the soap and candles and nearly one-half the bacon sides without inspection, because they knew they were of unexceptionable quality, and because the season for shipping and forwarding was advanced, we cannot see why the same prudence did not direct them to procure the whole of the supplies with like caution and of like quality, and cause them to be sent on their way. Had they done this they might easily have avoided the hazard which, it appears, they saw these supplies were to encounter from delay.
It may well be supposed that the direction for an inspection in Boston and New York was at the instance of the claimant, and for his benefit, doubtless to avoid, as far as possible, the transportation of such articles as might not be accepted in Arizona. It is apparent from the testimony of George Bacon that he did not consider an inspection obligatory upon the claimant or indispensable, for he says, “At any time in March, April, or May, I should have been willing to have sent these articles without inspection, rather than delay them at the enormous expense at which they were kept at Lavacea.”
The readiness of the claimant to acquiesce in an inspection (not being bound to do so wlien delay was so prejudicial, if not dangerous, to him) iudicates that he desired it, and that it was supposed his interests were to be promoted thereby. The government could protect itself by an inspection on delivery, and was not to be governed by a prior one. The advantages of inspection in Boston and New York were all in favor of the claimant, and were not designed to transfer the property to the government, or to change its character in any way, or to create any new liabilities.
However serious the loss of this claimant we do not find, upon the case presented, that he can obtain relief at our hands. The delay occasioned by waiting for an inspection of these supplies we have seen might have been avoided, and was unnecessary; and though we should concede otherwise, it may well be doubted whether the delay was the proximate cause of the loss to the petitioner. The real and immediate cause was the rebellion, an event not foreseen or contemplated.
We shall not attempt a disquisition upon the flexible rule of dam *66 ages depending- upon remote or proximate causes, nor collate the authorities, which, although numerous, are not to ho commended ox-approved for consistency; hut adopting the language of Domat, used in commenting upon an example given hy him to elucidate the proper rule in such cases, we hold “that these damages are rather an extraordinary effect of some event, and of some conjuncture of affairs, flowing from the Divine Providence, than of the delay of the delivery,” or, in other words, as applied to this case, of the inspection.
In considering this branch of the case we must not overlook the fact that this claimant appears to have selected a route for transportation which was unusual, and, in the result, one of greater hazard than that theretofore used for such purposes. The choice of routes, it may be, was open to the claimant; yet if he selected an unusual or extra hazardous one, it would affect his right to recover.- He was an independent and uncontrolled actor in that regard, and should bo held to the greatest degree of vigilance and prudence.
It is insisted by claimant that this case comes within the second section of the act of Congress approved March 3, 1849, entitled “An act to provide for the payment of horses and other property, lost or destroyed in the military service of the United States.” We do not understand that this act was designed to meet a case like this, nor do wo suppose the property lost or destroyed, as shown by this record, was in the military service within the meaning of the section referred to. But waiving all construction of this law, if the petitioner seeks redress under it, he must follow its provisions, and the third and fourth sections direct the manner of adjudication, and point out how and where relief is to be obtained; and until a claimant shall have followed the course indicated, and been denied redress, we cannot’ con•sider his claim.
The petitioner asks that $200,000, or such part thereof as may be Just and equitable, shall bo adjudged to him for profits lost by the rescission of his contract dated March 9, 1860. This demand seems -disproportionate to the probable profits to result from a contract which had so inauspicious and unfortunate a commencement. There arc several objections to this or any other allowance for the act complained of. It does not appear that any notice was ever given the claimant of any intention to rescind the contract, or of the fact that it was rescinded, and his conduct in the premises does not appear to have been in anywise controlled or influenced by the action of the *67 Secretary of War in that regard. There is no evidence that the claimant has sustained any actual damage by the abrogation.
Messrs. J. S. Watts and M. H. Dunnell for the claimant.
Mr. J. D. McPherson, Assistant Solicitor, for the government.
It is a matter of public history that all the troops in the Territory of Arizona were removed thence early in the year 1861, and that all the forts and government property there were either destroyed or abandoned; hence there was no occasion or use for supplies or transportation to or within that Territory.
If we were disposed to disapprove the conduct of the government officers for their apparent intention to deprive the claimant of his property in this contract, yet, in the condition of public affairs, it does not appear that he has sustained any damage from the act of which ho complains. The bare existence of a contract which only authorized the claimant to “furnish all the supplies that might be needed ” could be of no value to him if there was no need for supplies.
If there were no other objections to the allowance of damages for a supposed revocation of this contract we might well deny them for insufficiency of proof. Although no exception was taken to the copies of documents presented in this record, upon which this branch of the case depends, it may well be doubted whether any of them are properly certified and authenticated to make them substitutes for the originals.
Accident and the course of events have deprived this claimant of all chance of gain flowing from this contract, and the abrogation of it could not work any wrong or actual injury to him. There is nothing which this court can restore to him, and, unfortunately, his losses cannot be compensated. There were no fruits in this contract for him to gather, and he must abide his condition. We would be glad to know that this was a solitary case of wrong and injury inflicted by the rebellion.
The petition is dismissed.
Hughes, J., did not sit in the argument of this case.