Casey, Ch. J.,
delivered the opinion of tbe Court.
When tbis cause was before us on tbe demurrer, we ruled tbat tbe case, as tben presented in tbe claimant’s petition, could not be sustained as an award, because Secretary Floyd bad transcended bis powers under tbe submission, as limited and defined by tbe joint resolutions of tbe 3d March, 1857, and 15th June, 1860. And Congress having expressly repealed tbe latter resolution, and sent tbe case to tbis court for examination, it was to be beard and tried on its facts and merits, irrespective of tbe award. Tbe claimant, however, believing tbat tbe award is valid and binding, has again presented it as tbe foundation of bis right to recover, without attempting to prove tbe claim upon original grounds. We have very carefully re-examined •the case, and find it to be identically the same, in character and amount, *98 as when before us on demurrer. We-have also reviewed our former decision, and have been unable to reach any other conclusion than that arrived at, before; and shall state now more fully the reasons which influenced that decision.
The only difference in the presentation of the case grows out of amendments introduced, by which some of the averments of the petition are materially changed. The original petition distinctly averred, that De Groot “did transfer and surrender to the United States the brick-yard, land, buildings,” &c., which was the property of your petitioner. It was also alleged that Captain Meigs had desired and requested the claimant “to transfer and convey to the United States the said brick-yard, machinery,” Sec., “ and that petitioner reluctantly consented thereto.” Again it averred, “ the whole entire property was, under the arrangement aforesaid, conveyed and surrendered to the United States.” These averments plainly imported a sale or conveyance of the real estate to the United States. The amendments made and evidence given show that, in fact, but a lease of the brickyard was made to the United States, and no transfer of the land or title. While this obviates the objection that the United States could not be made the owner and holder of real estate without the authority of Congress, it does not meet or remove the principal and fatal defect alleged to exist in Floyd’s award. That defect consists in having estimated and included in his award a sum to be allowed the claimant in respect of the real estate, whether for a lease or a conveyance. De Groot may have been or still may be entitled to an allowance for the real estate, for its use and occupation, but it is sufficient for our purpose that Congress did not confer on Floyd the right to jmss upon that question. The money De Groot had expended; the losses, liabilities, and damage he had sustained and incurred were the subjects for the referee’s consideration, and to which his power and authority were limited. What allowance for rent of the real estate, or price for the clay to be used, the claimant should receive from the government, is by no fair interpretation of the terms of the submission committed to Mr. Floyd’s arbitrament. Such au allowance cannot be embraced and included in the words “money expended;” nor can it be said tobo ‘‘loss, liability, or damage sustained or incurred,” for all these contemplate a past transaction, while this sum was for the future use and occupancy of the real estate by the United States. This we held, and still believe, was the exercise of a power not conferred, and vitiates the whole award, unless the vicious part can be separated from the *99 residue of the report. In this case it is impossible to make such a separation. It is doubtless embraced in the large item of $29,323 22, but how much of that was for the real estate, and how much for other matters, it is impossible to tell. It therefore results, that this vice inheres in every part of the award, and corrupts and destroys it entirely.
We are also of opinion that Floyd exceeded the submission in allowing De Groot prospective profits, in the shape of damages. These are only giyen where there has been a clear and distinct violation of the contract by the party against whom they are allowed. The resolution of 1857, and that of 1860, were not based upon a violation of the agreement by the United States. The failure of Congress to make an appropriation to carry on the work was provided for by the contract, and the law under which it was made. The resolution referred to a mutual and amicable rescission of the contract, and the adjustment and settlement of the account was to be in accordance with that relation between the parties; for it was to be settled and adjusted on principles of justice and equity. It was an offer by Congress to the other parties to transfer certain personal property to the United States, and cancel the contract, and receive compensation for all that had. been expended under or lost by the contract. This offer was accepted, and on the 8th of April, 1857, the claimant joined with the other parties, claiming an interest in the contract, in the transfer and surrender required.
Floyd erred greatly, therefore, in treating as a breach or violation of the contract what was submitted only as a mutual and amicable rescission of it, and as authorizing and justifying prospective damages, when compensation for actual outlay and damages, actually sustained were contemplated. He equally erred in treating the contract as still subsisting after it had been annulled and cancelled by the most solemn and deliberate acts of ike parties, for the law is well settled that prospective profits are allowed because the one party was ready, willing, and able to perform his agreement, but was hindered or prevented by the other. And the law will not allow a party to reap any benefit from his fault or fraud, or the other to be deprived of the fruits of his agreement where he is guilty of no wrong, and was prepared to execute his contract in good faith. But these principles can have no place, no application, where the parties voluntarily relinquish their rights under the agreement, and dispense with all further performance, on the one side and the other. The claim to performance on the one side, and compensation on the other, stop right there. And we find *100 nothing in the joint resolutions of 1857 and 1860 to justify the inference that Congress or the claimant intended, that after the surrender of the property and the cancellation of the contract, it should be considered as still in existence for any purpose whatever.
This error runs through the whole of Floyd’s proceedings, he treating it all the time as one of violation of contract by the United States, against' the consent and to the injury of De Groot, instead of an agreement of rescission, which annuls all its stipulations and dispenses with all further execution of its provisions. The plain terms of the resolution of 1857 do not reach beyond the cancellation, but stop right there, and fix that as the point of time up to which the account is to be settled and the damages assessed. It would, in our opinion, be doing violence to the language used by Congress to say that the resolution of 1857 imports that the United States made this submission upon the footing that they had violated this agreement, and had hindered or prevented Mr. De Groot from performing it. If not to be found there, the resolution of 1860 does not help it, for it says expressly that De Groot shall be allowed the damages, &c., to which he was entitled under the resolution . of 1857. In. our opinion it would conflict both with the words and spirit of that resolution to say that it intended to embrace anything beyond the money expended, the damage, loss, or liabilities sustained or incurred during the existence of the contract.
The claimant’s counsel refers us to the report of the committee of the House of Representatives which reported the joint resolution of 15th June, 1860, as showing that it was intended by the submission to allow the prospective profits as well as the past damage. Whether the resolution was passed in the words and terms reported by the committee we have not examined, because we deemed it immaterial. A law can, in the first instance, be judged of and construed only by the terms uséd, in connexion with the object and purpose to be accomplished and the subject-matter to be affected by the enactment. The report of a committee is but the views of a small number of members. It is not always read even by a considerable number of their fellow-members, who judge of a bill or resolution by the words it employs or the provisions upon its face. And even were the report read by and known to all the members, a majority who vote for a law might be influenced by other views and considerations than are contained in the committee’s report, and might differ widely in their interpretation of the words employed.
Nor are the views expressed by members in debate any better guide *101 than tlie reports of committees in tlie interpretation of a statute. It rarely happens that a majority of legislators who vote for a bill or resolution engage in the debates upon it, and when they do we find them favoring it often for widely different reasons, and giving entirely different constructions to its provisions. In this very case, the views expressed by some senators in debate, who favored the passage of the resolutions, are in direct conflict with the House committee report. So that not only different members, but the different houses of Congress, take entirely different views of the purport and interpretation of a law which all agree in passing. So the President, who acts upon it, and in giving it his approval is part of the law-making power, is not supposed to have before him the reports of committees and the debates of members and senators, but may be influenced by other ideas and views than entered into the contemplation of either house. What the whole lawmaking power do agree upon is the passage of the law in the words in which we find it upon the statute book. And it is by applying these, in their ordinary signification, to the subject-matter, keeping in view the object of the legislation, that we arrive at a correct interpretation. Adopting these natural and well-settled rules in giving a construction to these joint resolutions, we are of opinion they did not confer upon Floyd the power to pass upon the question of prospective profits or assess any damages based on a violation of the contract by the United States, or upon the continued existence of that contract, after acceptance of the joint resolution of 1857, and the cancellation of the contract by De Groot, by his deed of the 8th of April of the same year.
If we are not mistaken in these views, there can be no question about the right of Congress to withdraw the submission and repeal the resolution of June 15, I860. Without the repeal the award made under it was a nullity; but Congress in express terms has repudiated the finding and disaffirmed Floyd’s action in the premises. Whether, if the award had been made in good faith, under a mistake of judgment and within the submission, Congress might have repealed the resolution, and thus defeated the finding, it is not necessary for us to determine in this ease, for we think there is abundant reason, both on the law and facts of this case, to justify Congress in their action, without inquiring into or deciding upon the constitutional question raised by the claimant and insisted upon so strenuously in favor of this award.
The claimant, although invited by the former decision in this case to present the evidence to sustain the claim upon original grounds, has chosen to rely mainly, if not entirely, upon the award. From the evi *102 dence adduced by the United States, it now appears doubtful, to say the least of it, whether at the date of the joint resolution of 1857 Mr. De Groot had any connexion with or interest in the contract. By his agreement with Mechlin & Alexander, and their conveyance of the brick-yard and its machinery, &c., to him, a deed of trust was provided for to secure them against his default, and to enable them to take possession of the yard and appurtenances when he should fail to perform his agreement by furnishing brick as fast as required for the work. The trustee was to act in the matter at the instance of Mechlin & Alexander, and it left them to judge when such default had occurred. That De Groot was in default with the brick the evidence very clearly shows. And Mechlin & Alexander availed themselves of their agreement with and deed of trust from De Groot to terminate his interest in the contract, and make a new contract with Kellogg, and to put him in possession of the brick-yard, where he continued for a whole year before the passage of the first joint resolution, making and delivering brick for the aqueduct. As for De Groot, he did not make, furnish, or deliver a brick for the Washington aqueduct for more than a year prior to the passage of the resolution, under which he claims that he was the sole owner of the contract, and that by the stoppage of the work by the government at that date his contract was violated in such manner as to entitle him to be considered as having fully and completely performed the whole contract, and to be paid and compensated accordingly. His counsel, it is true, have alleged that by some judicial proceedings, of the nature and character of which we are not advised, he had been remitted to his rights and reinstated in the possession of his property, of which he had boon unjustly deprived. But we have no syllable of any record produced to sustain this allegation.
But were this in every respect as alleged, wo do not perceive that it could help the claimant’s case in the least, for the evidence is clear and decided that he never had any contract with the United States, upon which he would have been entitled to damages for the loss of profits, or any other damages. De Groot’s contract was with Mechlin & Alexander, and they alone continued liable to the United States. He was, however, it is alleged, recognized by Captain Meigs, the government superintendent of the work, as the contractor. We find no evidence of such fact in this record, but the contrary. Captain Meigs had the accounts all kept in the name of Mechlin & Alexander, and treated with De Groot as he did with any other agent or employe of the contractors. He .was required to have a power of attorney from *103 them to enable him to transact any business whatever relating to the brick contract. And the agreement of De Groot with those men expressly provides that they are to remain primarily liable to the United States. Suppose the United States, instead of agreeing, as she did, to treat with these parties on the most liberal and magnanimous terms, had sued for damages for their many defaults and omissions to fulfil the contract, against whom would such a suit have been entered ? Would the claimant have been called upon to respond to damages ? Upon what. ground could such a suit have been predicated 1 Not upon any contract the claimant had with the United States, for none existed between them, and there never had been any in respect to this brick contract. If he was not bound; why should the olher party be? If there was no mutual obligation, there was no contract; and if no contract, it is then very clear there was no just or legal claim to any damages, for there could be no violation of that which did not exist. Contracts imply mutuality of rights and obligations; and such a thing as a contract which binds one party, and holds him liable to the utmost damage, and allows the other to violate its provisions with impunity without incurring any liability, would be an anomaly in the law. Nor is this view of the case obviated by the argument that the joint resolutions under which Floyd acted made De Groot a party by recognizing him as such. The first joint resolution names none of the parties, but refers to them as the parties interested in the contract for manufacturing brick for the Washington aqueduct. The second resolution names De Groot, but not as a party to the contract, much less the sole party to it, but as a party interested in it. To be a party to a contract and to be interested therein are different things, especially ■different from being the sole party entitled to claim the benefit of its provisions, to the total exclusion of all others. The evidence submitted to Floyd, if nothing more than the written papers and contracts, shows that De Groot’s interest was not such as to entitle him to any damages for the loss of prospective profits. Against his claim of being the sole owner of the contract, and entitled to all the compensation to be awarded, stood his own deed of surrender and the lease to the United States of the brick-yard. In both of these instruments, under his hand and seal, he recognizes in the most distinct manner ■the interest of Mechlin & Alexander, and of Kellogg, by joining with them in the same deed, and reciting therein their interest, a.nd the contracts and agreements under which they respectively claimed. Nor was this all. When the question of damages was pending before Cobb, *104 the Secretary of the Treasury, De Groot appeared jointly with Mechlin? & Alexander, and Kellogg &' Bates, and preferred his claim in connexion with them, and after the award was made entered into an amicable division of the amount of the award with these same parties, receiving over seven thousand dollars of the money as his share. If solemn, deliberate acts, in pais and by deed, can operate by way of estoppel, we should think De Groot would be precluded from setting up now the want of interest in these parties.
It may bo alleged that these facts were not before Floyd when he made his award. Such, we presume, is the fact. But they were not before him, because he refused to receive evidence of them when it was tendered by Dr. Bates, alleging as an excuse for not receiving it that it was De Groot’s account alone he was to settle, and he “was not at liberty to consider the interest any other parties may have in the contract.” Tet it will naturally suggest itself to the simplest comprehension that whatever “ interest any other party might have in the contract” would, to that extent, diminish the interest of De Groot, and lessen the amount he was entitled to recover. It is clear and plain, if' the writings and other evidence to which we have adverted were not before Floyd, it was either because he refused to receive it when offered or failed to require De Groot to produce the simplest and smallest degree of proof of his case, and to examine into circumstances and papers which lay directly in the line of his inquiry; or, having the evidence before him, he must have totally disregarded it; and in either case it would exhibit such undue bias and misconduct on the part of the referee as would render his award inoperative and void.
These views are attempted to be met and overcome by the arg,urnent that Floyd was a referee, and was, by the submission of the joint resolutions, to “settle and adjust the account upon principles of justice and equity,” and that the award is conclusive that all the facts existed and were proved which are necessary to sustain and give it validity. We have already shown that this cannot be, and does not apply, where the award, as. in this case, exceeds 'the submission. Nor do we understand that the direction to settle it ‘‘ on principles of justice and equity” gives a larger and wider range to the powers of the referee; for wo do not admit, as the counsel appear to assume, that this “justice and equity” is that vague, undefined and indefinable sense of fairness and right which would be as different in different cases as the varying passions and prejudices of men. But we understand and suppose it to mean those well-known principles which form. *105 the common and general standard of right and justice as administered in our courts of judicature, and which control and regulate the affairs of life between man and man. For law and justice are correlative and convertible terms; and equity means nothing more than that modification of the strict technical rules of law, in their application to a given subject, which guides a chancellor in the administration of equity, not by disregarding or overruling the law, but in so applying it as to prevent it being the means of fraud or injustice.
Mr. Henry Bennett and Mr. Cbiatfield for the claimant.
Mr. McPherson, Assistant Solicitor, for the government.
Were this award, however, invested with all the conclusiveness and inviolability claimed for it by the plaintiff, it would not affect the result of this case. Whatever other power may be denied to Congress, their right to prescribe and regulate the remedy for the enforcement of claims against the United States will scarcely be disputed, nor their authority to limit and control the jurisdiction of this or any other statutory court over any particular ease, as well as a class of cases, be seriously controverted. This causo is here under the special provision in the joint resolution of the 21st of February, 1861, repealing the resolution under which Floyd acted, and not by virtue of the general laws organizing this court and conferring its jurisdiction. That enactment directs the Secretary of War to transmit all the papers relating to the case to this court for examination. Our power and duty under the law is to examine the case upon the papers so transmitted and the evidence submitted by the parties. Nor can we, under the limited and special jurisdiction conferred, undertake to go behind the law and sustain a proceeding upon a resolution which, by the very law conferring our right to hear the cause, was repealed and annulled. Whatever the claimant’s right may be, his remedy in this court, as the law now stands, is not upon the award, for that is beyond our power and jurisdiction, but upon the papers and evidence in the case, unaffected by and irrespective of Mr. Floyd’s proceedings and report.
The claimant has submitted to us no evidence upon which he would be entitled to recover, but has relied upon the finality and sanctity of the award. We have endeavored to show that it has no validity; and even if it had, we are precluded, by the terms of the law referring the cause to us, to pass upon that question. There being, therefore, nothing before us to sustain the case, we enter judgment for the defendant.
Loring, J., dissented.