Richardson, J.,
dissenting:
I concur in tbe dissenting opinion of the chief-justice; and as to the right of the United States to recover back money paid in mistake of law by the executive officers of the Government, my views are these:
The general rule recognized in this country and in England, as between individuals, although not without exceptions, is that money paid in mistake of law, when all the facts are known to the parties, and there is no fraud, cannot be recovered back by action. This rule is founded on the maxim of the civil law, "ignorantio legis neminem exousat,” which, in its application to the administration of the law of crimes and offenses, is a concise and correct enunciation of a sound principie on grounds of justice and public policy. But when made the foundation of a rule, that money paid in mistake of law can in no case be recovered back unless fraud is proved, its application seems to me to be extended far beyond justification.
When one has committed a crime or offense, and has thereby done injury to persons and a wrong to the State, he may well be confronted with the maxim that “ ignorance of the law excuses no one,” and with justice may be compelled to submit to the penalty which the law imposes upon him for his wrongful act. But when one pays, in mistake of law, money which he does not owe, and which the receiver has no right in justice and conscience to retain, he does not, by demanding it back, commit a wrong, which he seeks to have excused on the ground of his ignorance or mistake of law; it is the receiver who does a wrong, and attempts to excuse it on the ground of mistake on the part of the person whose money he unjustly received and retains.
The rule has often been presented to courts in cases in which its application would work manifest hardship, injustice, and wrong; to obviate which it has been denied or explained away,, and sometimes a nice distinction drawn between ignorance and mistalce of law, by which the rule was restricted to cases of ignorance, but held not to apply to cases of mistake. This distinction, although supported by strong reasons, is too subtle ever to be of much practical use and importance. The Supreme •Court, in recognizing the rule, at the same time recognizes the fact that it has exceptions, and in one case attaches to it a *552 limitation. (Hunt v. Rousmanier’s Administrators, 1 Peters, 15 ; Bank of the United States v. Daniel, 12 Peters, 48.)
By several courts it has been held that “ money may be recovered back in an action for mouey had and received, where there is a full knowledge of all the facts, -provided that the mistake is clearly proved, and the defendant cauuot in good conscience retain it;" and, as obviating the necessity of exceptions and subtle distinctions, this would seem to be the better rule, and is supported by many authorities. (See, among other cases, Nortrup v. Graves, 19 Conn., 554; Culbreath v. Culbreath, 7 Geo., 64; Stedwell v. Anderson, 21 Conn., 139; Underwood v. Brochman, 4 Dana, 309; Hopkins v. Mazyck, 1 Hill Ch. R., 242; Lawrence v. Beaubien, 2 Bailey, 623; Lowndes v. Chisolm, 2 McCord Ch. R., 455; Robinson v. City Council, 2 Richardson, 317, 320; Farmer v. Arundel, 2 Wm. Black, 825; Moses v. Macfarlan, 2 Burr, 1002.)
But whether or not the maxim of the civil law justifies the general rule, either to the fullest extent or with limitations as between individuals, there are grave reasons of public policy and justice why neither the maxim nor the rule should apply without limitation when money is obtained from the Government through mistake of law made by its officers and agents.
The United States, as a body politic, act only by public officers, who are special agents intrusted with specific, defined duties, and who can bind the Government only to the extent of the authority conferred upon them. The state has no general agents; the President is limited in power and authority; Congress must keep within the bounds of the Constitution; the courts are restrained in jurisdiction by statute, and all public officers must obey the law. (Floyd's Case, 2 C. Cls. R., 599, and 7 Wall., 666.) But the acts of special agents within the scope of their authority are as binding upon the principal as are the acts of general agents.
When, therefore, public money is paid away by public officers, with a full knowledge of all the facts, but in mistake of law upon an honest interpretation and decision, it is necessary to determine how far those officers have been intrusted by the Government with the power and authority to decide in such cases, before the rule can be applied in any form; because, if they have no authority to decide controverted questions of law arising in the course of their prescribed duties, the Government would under no circumstances be bound by their decisions thereof.
*553 Money is paid out from the United States Treasury upon warrants signed by the Secretary of the Treasury, countersigned by the Comptroller, and recorded by the Register, (Rev. Stat., §§ 305, 313,) except money of the Post-Office Department, which is drawn upon warrants signed by the Postmaster-General and countersigned by the Auditor for that Department. (Rev. Stat., §§ 396,3674.) When received by a disbursing-officer, the -money still belongs to the Government, and must be paid by him according to law upon vouchers taken and returned to the Department for the settlement of his accounts. (Rev. Stat., §§ 3622, 3623.) Such officers are special agents, with very limited authority. Their duties are ministerial; they are to pay the money according to the law and the fact in each case, and if they make mistake in either they are personally liable therefor themselves, and the Government may also, without doubt, maintain an action to recover back the money from the person wrongfully receiving it. No discretion or authority to decide controverted questions of law is intrusted to such officers.
But for the settlement of accounts against the United States there is established by law a peculiar and well-appointed system, which requires in each case careful examination and consideration, and the judgment and decision of high officers, appointed by the President with the advice and consent of the Senate, called “accounting-officers,” of two distinct classes, acting separately, the Comptrollers reviewing and finally passing upon the action of the Auditors. The Auditors’ duties are prescribed in Revised Statutes, §§ 276-300, and are generally “ to receive and examine all accounts relating” to the different branches of the public service, “and after examination of such accounts to-certify the balances and transmit the same with the vouchers and certificates to the Comptroller for his decision.”
The Comptrollers’duties are prescribed by Revised Statutes, §§ 268-275, and are, among other things, “to examine all accounts settled by the Auditors,” and to certify the balances arising thereon; the First Comptroller to the Register, and the Second Comptroller to the head of the Department in which the expenditures have been incurred. Thus the accounting-officers stand in somewhat different relations to the Government from disbursing-officers, agents, and employés who have only ministerial duties to perform. They have larger power and greater authority, to be exercised according to their best judg *554 ment. They are to examine all accounts, the Auditors to state the balauces, and the Comptrollers to decide thereon. They must, of necessity, be intrusted, especially the Comptrollers, with the important duty of passing upon all questions of law or fact which may arise in the settlement of accounts and in the decision required as to the balances to be certified.
To decide means, “To settle, to terminate, to end, to conclude; applied to what is in dispute, question, or doubt.” (Worcester’s Dictionary.)
A decision implies more than ministerial duties, and calls for a determination by the Comptrollers of every question which may be raised upon the accounts and balances as stated and -certified by the Auditors, whose whole proceedings are subject to revision by the Comptrollers. By Revised Statutes, § 271, the First Comptroller may even direct Auditors, in case of delays which, in his opinion, would be injurious to the United States, “forthwith to audit and settle any particular account which such officers are authorized to audit and settle, and to report such settlement for revision and final decision by the First Comptroller.” This authority to direct accounts to be forthwith settled, before the passage of the Revised Statutes, w.as understood to belong to each Comptroller alike as to accounts within their respective jurisdiction, and was so exercised; but it seems to be limited in the revision, probably by inadvertence, to the , First Comptroller. We cite it here, however, only to show the duties of the Comptrollers in making their final decisions on accounts, and they are the same whether the settlements are sent up to them by the Auditors in the usual manner or by special direction. All such settlements are subject to the revision and final decision of the Comptroller.
To some extent, therefore, the Comptrollers are gwim-judicial officers, and like judicial and other officers who are charged with the exercise of discretion and judgment, and unlike ministerial officers, they are not personally liable for the correctness of their decisions when acting without fraud and jn good faith. In the performance of their important duties the accounting-officers may, through the Secretary of the Treasury, and often do, obtain the opinion of the Attorney-General upon doubtful ■questions of law, as may be seen by reference to numerous printed opinions of the Attorneys-General in such' cases.
The accounting-officers from the first maintained the conclu- *555 sivenoss of their decisions, at least against all other executive officers, and controversies early arose as to how, by whom, and to what extent those decisions could be reviewed and revised. Claimants often appealed to the President against the action of those officers in settling their accounts, but it was always held, ou the advice of successive Attorneys-General, that the President had no power to interfere. (1 Ops. Atty. Gen., 624; 2 id., 508, 544; 5 id., 630.) The Secretary of the Treasury, and other heads of Departments, still continued to claim the right to revise the action of the accounting-officers, and to change the balances certified by them, and this claim was sustained by the opinions of the Attorneys-General, and was generally, though reluctantly, acquiesced in by the accounting-officers. (5 Opin., 630.)
In 1868 Congress passed the act which is embodied in Revised Statutes, § 191, as follows:
“The balances which may from time to time be stated by the Auditor and certified to the heads of Departments by the Commissioner of Customs, or the Comptrollers of the Treasury, upon the settlement of public accounts, shall not be subject to be changed or modified by the heads of Departments, but shall be conclusive upon the executive branch of the Government, and be subject to revision only by Congress or the proper courts. The head of the proper Department, before signing a warrant for any balance certified to him by a Comptroller, may, however, submit to such Comptroller any facts in his judgment affecting the correctness of such balance, but the decision of the Comptroller thereon shall be final and conclusive, as before provided.”
This act settled a long-standing controversy between the accounting-officers and the heads of the Departments, and is significant in connection with the questions now under consideration, as showing the great authority, superior to that of the highest executive officers of the Government, which Congress reposes in tjie accounting-officers in the settlement and determination of balances of accounts with the Government.
It will be observed that, by the sections of the statutes to which reference has been made, the general jurisdiction of those officers is confined to matters of account. An “account” is defined by Chief-Justice Shaw thus: “The primary idea of account, computatio, whether we look to the proceedings of courts. *556 of law or equity, is some matter ot' debit autl credit, or demands in the nature of debt or credit, between parties. It implies that one is responsible to another for moneys or other things, either on the score of contract or some fiduciary relation of a public or private nature, created by law or otherwise.” (Whitwell v. Willard, 1 Metc., 216.)
This would exclude claims for unliquidated damages, founded, on neglect or breach of obligations or otherwise, and so, by the well-defined and accepted meaning of the word “ account,” and the sense in which the same and the words “accounting” and “accounting-officers” appear to be used in the numerous sections of the numerous acts of Congress wherein they occur, it would seem that the accounting-officers have no jurisdiction of such claims, except in special and exceptional cases in which it has been expressly conferred upon them by special or private acts. And such has been the opinion of five Attorneys-Geueral —all who have officially advised the Executive officers on the subject: Attorney-General Taney, in 1832, whose opinion is referred to by his successors in office; Attorney-General Kelson, in 18-14, (4 Opins., 327;) Attorney-General Clifford, in 1847, (4 Opins., 627;) Attorney-General Cushing, in-1854, (6 Opins., 524;) and Attorney-General Williams, in 1872, (14 Opins., 21.) And the same views were expressed by this court in 1866. (Carmick et al. v. The United States, 2 C. Cls. R., 126, 140.)
The appropriations by Congress for the support of the different branches of the Government, from which the balances found by the accounting-officers can be paid, are made for the payment of services rendered, materials furnished, and benefits conferred, which may be foreseen and estimated for with some degree of accuracy, and, unless specifically provided for thereiu, do not include authority to pay unestimated and unlimited amounts which those officers, without the ordinary forms and proceedings required in the trial of controverted claims in the courts of law, might in their discretion, upon ex-parte affidavits, in their ordinary course of business, allow as damages for violated contracts.
The present distinguished head of the Treasury Department, (Mr. Secretary Sherman,) in a circular-letter recently addressed to the accounting-officers and others, thus justly and correctly calls attention to the admirable organization of that Department to pass upon accruing demands and accounts, and the *557 difficulties and dangers attending the allowance of other claims, and especially of those long past due. He says:
“ The Treasury Department is admirably organized to pass upon accruing demands upon the Government and upon the accounts of disbursing-officers. All its machinery aud checks are adapted to this duty, and no serious complaint has been, or is likely to be, made of the proper discharge of this duty. But when claims long past due are presented upon ex-parte evidence to officers who have no means of calling witnesses, no powers to cross-examine them, no modes of testing the sufficiency of testimony or its credibility, none of the safeguards of an open court of justice, the passage of fraudulent claims is unavoidable. Congress has by law provided a Court of Claims, where, within a limited period, all demands founded upon contracts may be presented and openly tried and decided. If this remedy in any case should be insufficient, claimants can appeal to Congress, which may grant either a new trial in the courts or a reexamination in the Departments, or directly furnish such relief as-it deems right and proper. The Treasury Department is not a Court of Claims, and the reason for withholding the ordinary powers of such a court became apparent to Congress by actual errors that had occurred.”
That public,policy requires that public officers should be held to the performance of their duties within the strict limits of their legal authority, and that as a general rule the Government should not be bound by their mistakes, or their errors of omission or commission, there can be no doubt; aud public policy would seem equally to require that when the vast accounts of collectors and disbursing officers, charged with responsible trusts and under heavy bonds; the complicated accounts of persons furnishing supplies to the Army, Navy, and other branches of the Government; the accounts of individuals dealing in thousands of ways with the constituted authorities, as well as accounts for the salaries of public officers to whom it is often of great importance to know exactly how much they can depend upon receiving, when passed upon and settled by officers of such high authority as the accounting-officers acting within the exact scope of their authority, and the balances certified by them tp the heads of Departments to which they relate, aud by them directed to be paid, and then paid by warrant drawn on the Treasury according to law, and the payment acquiesced *558 in by the claimants, such settlements should be held final and . conclusive on the G-overnment, unless impeached by fraud or mistake as in like cases between individuals.
Mr. Justice McLean, in an opinion delivered in the Supreme Court in 1834, thus expressed his views: “The accounting-officers of the Treasury act upon the accounts, and give the credits-as entered their officia sanction. The vouchers of an individual are all- submitted to these officers and their decision has-always been considered as conclusive upon the Government,, but not so as against the individual. The law expressly provides that rejected items may be allowed by the court [referring' no doubt to the provisions now incorporated, into Revised Statutes, §§ 951, 952.] * * * In the performance of their official duty, the Treasury officers act under the authority of law; their acts are public, and affect the rights of individuals as well as of the Government. In the adjustment of an account they sometimes act judicially, and their acts are all recorded in the books and files of the Treasury Department. So far as they act strictly within the rules prescribed for' the exercise of their powers,, their decisions are in effect final; for if an appeal be made they will receive judicial sanction, [probably referring to the provisions-now incorporated into the Revised Statutes, § 886.] Accounts amounting to many millions annually come under the action of these officers. It is, therefore, of great importance to the public and to individuals that the rules by which they exercise their powers should be fixed and known.” (United States v. Jones, 8 Peters, 375.)
The language used by Attorney-General Browning, in an opinion given to the Secretary of the Treasury in 1868, upon the claim of a collector of customs to have the accounting-officers open and re-adjust an account settled with them, in which he claimed that errors had been made in the amounts allowed him, founded on mistake of law, although used with reference to the opening of settled accounts at the request of a claimant, applies with equal force when the Government seeks to open the same. He says:
“It- has been repeatedly held that where an account has once been duly adjusted, settled, and closed by the proper officers, with a full knowledge of all the facts, and where no errors in calculation have been made, it cannot be re-opened without express authority of law, and must be regarded as final and con- *559 elusive. No subsequent decision upon a doubtful or controverted question of law, essentially modifying a prevailing rule wbicb was applied to tlie settlement of an account, would authorize the re-opening of it, with a view to a re-adjustment of it in accordance with such decision.” (12 Opinions, 386.)
If the rule were otherwise, and nothing can be regarded as settled against the Government in the adjustment of accounts except what is determined by the Anal judgment of the courts, it would follow, as no statute of limitation bars actions brought by the United States, that any account settled since the first organization of the Government might be re-opened, and parties brought into court upon a claim for money paid them in mistake of law,-upon the caprice of successive Comptrollers, who are by law charged with the duty of directing suits and legal proceedings to be instituted for the recovery of debts certified by them to be due to the United States,' (Rev. Stat., § 269,) or whenever a new construction is placed on a statute, different from that which the same or a former Comptroller adopted in the settlement of earlier accounts, materially changing the balances, although there were no frauds, mistakes., or concealments of facts, and the parties had dealt with the Government on the basis of the former rulings, and had long acquiesced in the settlement.
But the strength of the position that money paid in mistake of law, upon the decisions of the accounting-officers “ acting strictly within the rules prescribed for the exercise of their powers,” with a full knowledge of all the facts and in the absence of fraud, •cannot be recovered back, except in cases in which it could be so recovered under like circumstances between individuals acting for themselves, does not rest merely upon the conclusiveness of those decisions, for until they are consummated by actual payment they are not binding and conclusive, except to the extent specified in the act of 1868, before cited, (Rev. Stat., § 191,) and are never so regarded.
In the case of Chorpenning v. The United States, (91 U. S. R., 397; ante, p 119,) wherein'the Postmaster-Gen eral was, by special-act, authorized to investigate and adjust certain claims, to be settled as therein provided, and Congress repealed the act after the Postmaster-General had found and stated a balance due to the claimant, but before the same was paid, and he sued to recover the amount so found due him, the Supreme Court *560 held that he had no canse of action, and in the opinion of the court Mr. Justice S wayne thus refers to the powers of accounting-officers: “The adjustment having been made under a special law renders it in no wise-different as regards the point we are considering from those made daily by the accounting-officers of the Government, under the general law conferring their powers and prescribing their duties. The idea that the Government is finally concluded by the results at which they may arrive would be regarded as a novelty within and without the several Departments.”
Congress, as we thus see, may interfere, and the head of a Department to which a certified balance relates, if he cannot change the balance, may submit to the Comptroller any facts in his judgment affecting the same and require a decision thereon, or he may s.end the claim to this court for final adjudication, as has been done in many cases. (Delaware River Steamboat Company's Case, 5 C. Cls. R., 55; Winnissimmet Company's Case, Reybold’s Case, and Hart's Case, ante, p 319.) And the Secretary of the Treasury, or the Postmaster-General, in case of accounts in his Department, has the right, and it would be his duty, to refuse to grant or sign a warrant for the payment of any certified balance which in his opinion is wholly invalid and not provided for by an appropriation authorized by law, (Constitution, art. I, sec. 9; Rev. Stat., §§ 248, 3674, 3675, 3678,) until the case had been transmitted by him to this court for adjudication or submitted to Congress for an appropriation.
Jt is only when payment has been made on the requisition of the head of a Department and the warrant of the Secretary of the Treasury, or of the Postmaster-General in his own Department, sanctioning and giving effect to the action of the accounting-officers, each acting strictly within the jurisdiction conferred upon him by law, and the settlement thus consummated has been acquiesced in by the claimant, that it would seem to be binding and conclusive in like manner as settlements between individuals.
If, however, the claimant does not acquiesce in the settlement, but brings his action in this court within the time limited by law, he cannot well object if the account is re-opened throughout, stated anew, and a balance found either way, according to the l.aw and the facts as found by the court. A case arose in 1854 illustrative of these views. Coroners in the District of *561 Columbia bad, for a series of years, been allowed from the Uuited States Treasury payment for fees of inquests super visum corporis. A coroner whose accounts had been previously settled and paid asked for a re-opening and re-adjustment of the same, on the ground of alleged errors on the part of the accounting officers in not allowing him so much for fees as he was entitled to. The matter was referred to the Attorney-General, who held that coroners were not entitled to be paid anything’ out of the United States Treasury in such cases. In his opinion, Attorney-General Cushing said: “Whatever fees in the premises have been paid to the coroner heretofore out of the Treasury of the United States have been paid, it seems, by traditional practice for some years, in consequence of an erroneous construction of the act of 1838, adopted without due reflection and examination of the Treasury Department. That construction was manifestly against law. I do not recommend that the coroner be called upon to refund the money he has received. The Government has voluntarily paid it in its own wrong, and perhaps ought to submit to the loss. I am accustomed to advise acquiescence in what is done as done.” (6 Opinions, 568.) And in a supplementary opinion in the same case he adds: “Accounts have sometimes been opened on the application of a party for the correction of a manifest error of law committed to his prejudice. But if one party insists upon, having the accounts open to re-adjust them, in view of correcting errors committed to his prejudice, it would be right and the duty of the accounting-officers to correct, at the same time, any error committed to the prejudice of the other party. The effect of this will be that, if the accounts are re-opened at the instance of the coroner, the re-adjustment must be complete and legal in all its parts, and he may be called upon to account for the money which he has received unlawfully heretofore by mistake of the Government.” (6 Opinions, 576.)
On the whole, my opinion is, that when a claimant, not acquiescing in the settlement of an account or claim by the accounting-officers and the payment thereof, brings his action in this court.to recover an amount beyond what has been allowed and paid to him, the United States may maintain a counter-claim, under the provisions of Revised Statutes, section 1059, clause 2, for any money received by him on such settlement, when it appears that the officers of the Department *562 exceeded their powers in exercising jurisdiction over the claim, and mistook the law applicable thereto, and the money paid was not legally due to the claimant and could not have been recovered by action in this court, or otherwise, and cannot in conscience be retained by him.
This is all that it is necessary to determine for the purposes of this case.
In McElrath’s Case, (ante, p. 201,) McBlrath had been paid half-pay, as on leave of absence, as an officer of the Marine Corps, upon the mistaken decision of the accounting-officers that he was by law a first lieutenant of that corps during the time for which he was so paid; and he, not acquiescing in the settlement, brought his action in this court for the balance of full pay. He had been an officer of the corps, sent in his resignation, which was not accepted, and he was peremptorily dismissed from office. He engaged in other occupations, performed no service for the Government and offered to perform none, and after a time, as an act of favor, the Secretary of the Navy revoked, or attempted to revoke, the order of dismissal, and accepted his resignation to take effect at the date of said revocation. During the whole intervening time his place had been filled by the appointment of another person to the vacancy created by his dismissal, and the corps had the full complement of officers authorized by law, exclusive of the claimant. The court held that his attempted restoration by the Secretary of the Navy had no legal effect; that the accounting-officers erred in deciding that he was during the time an officer of the Marine Corps entitled to pay; that the officers of the Department exceeded their jurisdiction in paying him half-pay while he was not in office, and that he had no legal claim to the money paid to him and could not in conscience retain it. And the court gave judgment upon the counter-claim. against him for the amount which he had illegally received.
In the case at bar a majority of the court hold that the clause in the contract of June 20,1864, whereby the defendants were made to promise that “it is expressly understood by the contracting parties hereto that sufficient guards and escorts shall be furnished by the Government to protect the contractors while engaged in the fulfillment of this contract,” was void, as not warranted by the advertisement inviting proposals, and as inserted without legal authority, for the reasons stated in the *563 opinion just read by Judge Nott, in which, so far as it relates to that clause, I concur. And a minority of the judges hold, also, that the contract of July 18, 1864, was void, because not made in conformity with the requirements of law, by which advertisements for proposals are to be published before such contracts are entered into, and if not, then that the clause promising protection, in the same language as that in the contract ot June 20; above quoted, so far as it relates to property destroyed by the public enemy in time of war, was beyond the authority of the officer making the contract to insert, and was to that extent an excessive assumption of power, against public policy, and void. (Yattel’s Law of Nations, 403.)
All the money paid to the claimant, which forms the subject of the counter-claim set up by the defendants, was allowed and paid in fact as damages, unliquidated damages, for breach of the agreements in the protection clauses of the contracts, on the part of the defendants, measured by the value of the claimant’s property destroyed by the public enemy in time of war, for want of sufficient military escorts and other defenses and protection by the Army in the field.
The manner of estimating the claimant’s damages by stating an account of his actual losses does not make this claim .one of “account” within the meaning of the law and of the statutes defining the duties of the accounting-officers. In whatever form settled it was a claim for damages.
That the claimant was not entitled to damages by settlements in the Executive Departments, by action in this court or otherwise, for such breach of such clauses so inserted in the contracts, and for property thus destroyed by the public enemy, I think is clearly shown in the opinion of the chief-justice.
When a contract is annulled or broken on the part of the United States before completion, the contractor, waiving his claim to damages, may, if he so elects, have his accounts settled, as for part performance, at the rate and according to the conditions of the contract; and such accounts would be strictly within the jurisdiction of the accounting-officers of the Treasury Department. (6 Opinions, 499.) But that is not this case. The claimant’s contracts were for the delivery of hay at specified places and at agreed prices, and the only part performance' which could have occurred in such case would have been the delivery of a portion only of the hay contracted for. The *564 investments of the claimant in property preparatory to or in the performance of his contracts was not part performance of the same. And the property used by him in cutting hay was not in the service of the United States nor under their control. (Grant v. The United States, 1 C. Cls. R., 61; affirmed on appeal, 7 Wall., 331, 7 C. Cls. R., 53; Stuart v. The United States, 18 Wall., 84; John S. Shaw v. The United States, 9 C. Cls. R., 388; affirmed on appeal, ante, p. 1.)
Moreover, the claimant does not acquiesce in the settlement, but brings this action to recover an amount beyond what has been allowed and paid to him. He cannot, therefore, in law or justice, well complain if the United States on their part no longer acquiesce in the payment, and, in defending themselves, at the same time seek to recover back the money paid to him, without authority of law, by their special agents acting beyond the limits of their jurisdiction.
Had the claimant himself not disturbed the settlement by bringing the defendants into this court, the- United States would no doubt have abided by the action of their officers, as they have done before in hundreds of cases which must have occurred in the nature of things during the past eighty years and more, in the course of the almost countless, multifarious, and complicated accounts which have been adjusted and settled in the Departments, wherein the executive officers have acted upon-interpretations of statutes and views of the law, and of their own powers and duties, honestly and fairly arrived at, as we believe they were in this case also, but which the courts, after arguments by persons learned in the law, and more thorough consideration, would be constrained not to uphold. And because the United States do nob in their ordinary business disturb settlements in which the claimants acquiesce, it does not follow that they have no right to recover back payments illegally made on those which the claimants themselves re-open by actions bringing the Government into court.
In my opinion the defendants are entitled to recover the amount of their counter-claims.
I am authorized to state that the chief-justice concurs in this opinion.