**KRAEMER MILLS, INCORPORATED**

v.

**The UNITED STATES.**

No. Cong. 8–59.

United States Court of Claims.

July 12, 1963.

Malcolm M. Heber, Royal Oak, Mich., for plaintiff. J. W. Hutson, Royal Oak, Mich., was on the brief.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before JONES, Chief Judge, and LARAMORE, DURFEE and DAVIS, Judges.

JONES, Chief Judge.

This is a congressional reference case filed with this court pursuant to Senate Resolution 182, 86th Congress, 1st session, directing us to submit a report on

the nature and character of the demand as a claim, legal or equitable, against the United States and the amounts, if any, legally or equitably due.[1] The petitioner seeks relief from certain losses which it sustained under a contract to produce mahogany lumber for the United States during the second world war. The full facts of this case are set forth in the report of the trial commissioner, *infra*, which we adopt in its entirety. However, it will be convenient at this point to review the pertinent facts in brief form.

Plaintiff is a Pennsylvania corporation engaged, during the years immediately prior to the events of this case, in the manufacture of upholstery material for automobiles. This corporation, and another, were wholly owned by Mr. Ray Springer and his family. In October of 1942, Mr. Springer was approached by representatives of the Resources Corporation International, a domestic corporation which, through its wholly owned subsidiary, held title to certain forest tracts near Sarabia, State of Oaxaco, Mexico. These individuals represented to Mr. Springer that their land contained a large stand of mahogany and other valuable hardwoods, and they provided Mr. Springer with the report of a survey made upon this land in 1941 by one Samuel Solis, a forester accredited under the Mexican Forestry Registration. That report contained an estimate which showed the existence of quantities of mahogany sufficient enough to make a logging operation commercially feasible.

Mr. Springer had no logging experience, but he knew that mahogany was in short supply and was thus persuaded by these representations that the exportation of mahogany logs from this tract for sale to the United States would prove to be a profitable enterprise. Accordingly, he entered into an assignable option on the Mexican land which he subsequently exercised by purchasing the exclusive right to cut timber thereon for 5 years if only mahogany were sought, or for 20 years if he desired to cut other marketable species.

Mr. Springer entered into negotiations with representatives of the Government during which he provided them with the Solis report as evidence of the existence of mahogany trees on the Mexican tract. These negotiations culminated, in 1943, with the plaintiff corporation and the Defense Supplies Corporation entering into contract number 44–P–49 providing for the delivery by plaintiff of approximately 2,500,000 board feet of mahogany logs to the United States during the 1943 cutting season. This contract was signed by Mr. Springer as plaintiff's president even though he had made no independent investigation of the existence of timber of any kind on the leased land. It is also a matter of record that Mr. Springer had been advised by his attorney and his accountant not to undertake a venture so fraught with the possibility of failure.

Contemporaneous with the execution of the above contract, the parties also executed contract number 44–M–1, known as the Lease contract, whereby the Government agreed to purchase approximately $125,000 worth of logging equipment, supplies and parts, and to lease this equipment to the plaintiff for a period of 3 years from the date of delivery. The plaintiff was to pay rent for this equipment with the option of applying these payments to the purchase of the equipment at any time prior to the expiration of the lease period. If the option to purchase were not exercised prior to such expiration, however, the machinery would then revert to the possession of the United States Government. The key provision of this contract, as it affects our case, was the condition that the leased equipment was to be used for no other purpose than the production and exportation of mahogany logs to the United States.

---

[1]. Since the evidence in this case was taken, and the findings of the trial commissioner reported prior to the opinion of the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), we think it proper to file the report without reference to the Supreme Court's opinion in that case.

Plaintiff launched into the logging operation, expending approximately $150,000 of its own money for the construction of a logging access road and base camp, as well as for miscellaneous operating expenses. It was not until late 1943 that Mr. Springer discovered that the amount of mahogany standing upon the land had been grossly misrepresented. As a matter of fact, the actual stand of mahogany was so sparse as to be insufficient to pay the expense of cutting and removing it from the logging area. This discovery touched off a series of communications between the parties extending over the period from June of 1944 to February 1945. In essence, the plaintiff sought to modify contract 44–M–1 to permit it to utilize the Government-owned machinery to cut, for local sale, valuable hardwoods other than mahogany. Plaintiff hoped in this manner to mitigate or neutralize its losses. The Government eventually agreed to this proposal, but only upon condition that plaintiff first pay to the United States all amounts then due and overdue for equipment rental. The plaintiff, claiming financial inability to do this, notified the Government that it was no longer possible to carry out the terms of contract 44–M–1, and that it stood ready to redeliver the machinery, parts and equipment received thereunder. In response to this notification, the Foreign Economic Administration sent an agent to Mexico to accept the delivery, only to discover upon his arrival that the property was in the physical possession of local creditors. Although the exact amount which was expended to secure the release of this equipment from these creditors is not known, the amount of $50,000 was advanced to the agent to be used for that purpose if necessary. It is known, however, that whatever the cost, the United States satisfied the local demands in June or July of that year, and regained possession.

Plaintiff readily admits its default on the contract, but nonetheless contends that this default was due solely to the misrepresentations of the landowners and the Solis report. It is plaintiff's position that since Mr. Springer acted at all times in good faith in the service of his country, the United States in all fairness should have permitted the requested contract modification so that plaintiff could have mitigated its losses, or even made a profit. The plaintiff indicates that certain equities should be found in its favor due to the urgency of the wartime economic situation, the critical shortage of the mahogany, and Mr. Springer's willingness to assist the war effort.

■■ Regardless of the good intentions, however, it must be immediately apparent that the petition sets forth no legal claim. It is our opinion that were the operative facts of the case such that a legal right were created in the plaintiff, that right would be barred at the outset by the statute of limitations.[2] More than 14 years elapsed between the time that plaintiff abandoned its contract and the filing of the petition in this court. Plaintiff propounds two reasons why this statute should not be applied but we find both to be unpersuasive.

■■ The plaintiff draws our attention to the fact that the Government did not at any time render a final accounting with respect to the repossession of the leased equipment. This fact, it is urged, has bearing upon the proposition that the statute of limitations does not begin to run until the parties come to and strike an account between them. The rule contended for has its application, of course, in a proper case.[3] But it has no validity if applied to the situation now before us. The rule has vitality only in cases involving mutual accounts or where the United States is placed in the position of a fiduciary with respect to the funds involved. In regard to mutual accounts, it is apparent that plaintiff misconstrues the meaning. Williston, in a general

2. The statute is jurisdictional in this court. United States v. Wardwell, 172 U.S. 48, 52, 19 S.Ct. 86, 43 L.Ed. 360 (1898).

3. See, e. g., Louisville & Nashville RR Co. v. United States, 47 Ct.Cl. 129 (1911), and cases cited therein.

commentary on the subject, accentuates the weakness in plaintiff's position:

"* * * it is generally held essential, in order to constitute such an account as shall fall within the principle in question, that there shall be mutual open, current dealings and claims subject to a future final balance." [Williston, Contracts § 2030, adopted by this court in Hermann v. United States, 81 F.Supp. 830, 113 Ct.Cl. 54 (1949).]

There were no such mutual and open accounts in this case. Secondly, insofar as the plaintiff relies upon the creation of some sort of trust on the part of the Government, this court has made it clear that while every duty of a public officer is in the nature of a trust, one injured by the violation of such duty must bring legal action for relief within the period provided for by the law. Hermann v. United States, supra, 81 F.Supp. at 831, 113 Ct.Cl. at 60. It cannot be disputed that the transactions set forth in this case do not establish any greater trust than that of a general nature as referred to in the Hermann case.

 Plaintiff also contends that defendant's failure to issue a formal termination of the contract prevented the statute from beginning to run. There is, of course, no fixed rule regarding the exact point in time at which a cause of action springs into being, entitling a plaintiff to bring suit. In contract situations, the terms and conditions of each particular agreement must be studied in relation to its own plane of reference in order to determine when that point is reached. Holton v. United States, 65 F.Supp. 903, 106 Ct.Cl. 477, 499 (1946). But it is a mistake to assume that the contract must be terminated by some clear-cut agreement of a formal nature in order to give rise to a cause of action in the plaintiff. The case before us is similar in that respect to Enright v. United States, 54 F.2d 182, 73 Ct.Cl. 416 (1931), cert. denied, 286 U.S. 543, 52 S.Ct. 495, 76 L.Ed. 1280 (1932). The plaintiff therein sought to avoid the bar of limitations on the ground that the Government's written notice of termination was insufficient to start the statute running because it did not use explicit language such as "cancel" or "cancellation", but had in lieu thereof simply notified the contractor to "suspend all work and hold up all commitments." This court held that the subsequent conduct of the parties showed that neither party contemplated any further work under the contract unless other arrangements were made. It is just as clear to us now that neither the Government nor Mr. Springer contemplated any further performance of contract 44–M–1 after the latter sent notice that plaintiff would no longer be able to continue. The plaintiff stated its intent to terminate, and the defendant indicated its acquiescence by sending its agent to Mexico to reclaim the leased property.

 It is equally clear that on the merits the plaintiff has no legal claim. Reduced to its essence, plaintiff's claim is that because of the peculiar wartime situation, the United States became obliged to protect plaintiff's high-risk enterprise. We do not concur with that proposition. As we said in De Groot v. United States, 1 Ct.Cl. 97 (1864), aff'd 5 Wall. 419, 72 U.S. 419, 18 L.Ed. 700 (1866), prospective profits are allowed only when there has been some breach by the party sought to be charged. In National Laundry Co. v. United States, 63 Ct.Cl. 626 (1927), a Government agent made an unauthorized statement to a prospective contractor that the laundry business he might expect to enjoy at a certain military reservation would approach $12,000 per week. In reliance upon that figure, plaintiff, as successful bidder, provided laundry facilities adequate to the anticipated task. When the business failed to approach the represented proportions, the plaintiff sued for lost profits. This court, in denying relief, said: "Their [the parties] opportunities for information on this matter were equal." National Laundry Co., supra, 63 Ct.Cl. at 629. This is an articulation of the consistent position of this court that the United States is not an insurer of any

contractual undertaking. In still another case in this area, the plaintiff contracted to provide the Quartermaster Corps with needed supplies, but before delivery could be made those supplies were captured by enemy troops. The court denied the plaintiff lost profits. Grant v. United States, 1 Ct.Cl. 61 (1863), aff'd 7 Wall. 331, 74 U.S. 331, 19 L.Ed. 194 (1868). All this goes to show that lacking fault on the part of the Government, there is no obligation on its part to guarantee any contractual party a successful venture.

All that we have said thus far is equally applicable to the issue of whether the plaintiff is entitled to equitable relief. Counsel for the defendant calls our attention to the recent decision of this court in Teutsch v. United States, Cong. No. 2–54, decided April 7, 1961, 288 F.2d 920, and we agree that the principle enunciated therein is the proper one to be applied to the case before us. In that case the plaintiff, with no prior experience in mining, obtained an RFC loan to embark upon business of mining ceramic and lava talcs for use as dielectric material for electronic spacers. Because the need for lava talc was the greater, the Government urged the plaintiff to emphasize the production of that mineral in preference to ceramic talc. Unfortunately, the mining of lava talc could not be undertaken at a profit and plaintiff's ceramic talc business never became developed to the point where it would offset the losses sustained. When plaintiff sued to recover its profits, the court said:

> "We feel that unless the United States was directly responsible for some restraint on plaintiff's production of ceramic talc or for the loss of markets for that item, there can be no equitable obligation upon the United States." [Teutsch, supra, 288 F.2d at 923.]

If anything, the position of the present plaintiff is even weaker than that of its counterpart in Teutsch, in that in this case the initiative to cut mahogany was entirely upon the plaintiff.

Though plaintiff's impetration regarding its support of the war effort reflects a commendable attitude, the plaintiff in Teutsch was no less well motivated. Mr. Springer entered this undertaking with every assistance from the Government, and, although the risk was great, the potential profits were correspondingly high. In that light the equities, if any, lie on the side of the United States, especially since the losses of the Government were at least as large, possibly larger than those of the plaintiff.

Since we are of the opinion that the plaintiff is neither legally nor equitably entitled to compensation for its losses, we need not consider the issues raised concerning the propriety of certain elements of damage.

This opinion and the findings of fact incorporated herein will be certified by the Clerk to the Congress pursuant to Senate Resolution 182, 86th Congress, 1st session.