Howry, J.,
delivered the opinion of the court:
The findings establish payment by plaintiff of certain necessary incidental expenses and large sums by way of interest on account of certain temporary and extended loans made on obligations of the State of Pennsylvania (for which as to the long time loans registered and coupon bonds were duly authorized and issued) for money borrowed and used by the State in enrolling, subsisting, clothing, supplying, arming, equipping, paying, and transporting its troops under the act of Congress approved July 27,1861 (12 Stat. L., 276), and the joint resolution of March 8, 1862 (12 Stat. L., 615).
But the State did not present any claim on account of these expenditures until December 14, 1896, alleging as an excuse therefor that prior to the time when the claim accrued the accounting officers of the Treasury, as well as the Attorney-General of the United States, had decided that the act of 1861 (supra) did not give the Secretary of the Treasury jurisdiction to adjust and settle claims for expenditures on account of interest, in consequence of which the State deferred presentation of its claim until the Supreme Court of the United. States determined in the case of the State of New York against The United States (160 U. S. R., 598) that similar expenditures for interest were recoverable. Thereupon the claim was presented to the Treasury, but the Secretary, deeming that controverted questions of law and fact had arisen in considering the matter of any payment at all, or if payable that uncertainty existed as to the method of adjustment, transmitted the record pertaining to the matter to this court, under the provisions of section 2 of the Act of March 3,1883 (22 Stat. L., 485), with certain inquiries now to be considered.
No doubt exists as to the justice of this demand for interest expended. Such expenditures when actually disbursed became a part of the aggregate principal properly paid by the State *524 for the General Government, according to the decision in United States v. New York-(160 U. S. R., 621). So, by this decision no question arises as to the propriety of the expenditures for interest.
But it is argued for defendants that Pennsylvania did not claim anything for interest on money borrowed for a period of more than thirty years after all her other claims had been presented and substantially adjusted and paid, which must be taken as proof that the present claim is stale; that the effect of its being withheld, together with claimant’s acquiescence in the rulings of the Treasury Department, establishes staleness, which necessarily excludes any payment whatever now. And further, that as claimant did not bring suit in this court within the statutory period of limitation, the Secretary should be advised that such failure works an estoppel upon the belated assertion of the demand; that the claim is too intimately connected with the principal claims already allowed to. admit of further consideration, because the State can not be allowed to so divide its original cause of action as to be entitled to further payments.
Claims against the United States, cognizable by this court, are barred unless filed within six years from the time the claim first accrued. Section 1069 of the Revised Statutes is jurisdictional as well as a statute of limitation limiting the cases of which the court can take cognizance. (Wardwell v. United States, 172 U. S. R., 51; Finn v. Same, 123 U. S. R., 123.) As this claim accrued more than six years before it was filed in the Treasury, no request has been made in this court for judgment, or can now avail for that result. The duty of the court is to declare such rules as shall guide the Secretary of the Treasury in his action. Its jurisdiction to do more not being asserted, but its power to do that much not being denied, the first question to be considered is the right of the Secretary to adjust the claim.
The act conferring jurisdiction upon the Secretary to pay claims for interest on money borrowed by the States did not impose a time limit upon their presentation. While it is true that the failure of the Secretary to pay opened the doors of this court for the enforcement of disbursements properly made under the act of 1861 by any State, and the remedy continued *525 here at any time within six years after such claim first accrued, it does not necessarily follow that the Secretary lost jurisdiction because such claims were not presented to him within six years. The act of 1861 not only conferred jurisdiction upon the Secretary of the Treasury to pay the costs, charges, and expenses properly incurred by any State for the purposes indicated in the act, but directed him to pay. Mere delay in presenting it is not necessarily fatal.
For the reason that the Secretary of the Treasury was the proper officer to adjust the expenditures of the States under the act of 1861, the statute of limitations, which could be interposed to the demand if presented to the courts after six years, did not necessarily operate to determine the action of the Secretary.
In explaining some of the intricacies of the law affecting our jurisdiction, the present chief justice, in the case of Balmer, surviving partner, v. United States (26 C. Cls. R., 82), said:
“There are claims which are barred in one place, but not in another; claims upon which an action can not be maintained upon the merits in a court, but which, nevertheless, can be settled at the Treasury. These are the great class of claims whereof the accounting officers have jurisdiction.”
Thus, it will be seen, that there is precedent for the anomaly that the statute of limitations may apply to a right of action in this court and not apply to a demand for an accounting at the Treasury.
The door for settlement at the Treasury may not always be open, however, by reason of the laches of the claimant so operating upon the rights of the Government as to cause prejudice to its interests, or the conduct of the claimant be such as to estop the further assertion of the demand.
The reason for the application of the law of laches as well as the principle of limitation is found in the lapse of time which carries with it the life and memory of witnesses, the muniments of evidence, and other means of-proof. (Brown v. Buena Vista, 95 U. S. R., 161.) Length of time is not always a test of staleness. (Paschell v. Hindever, 28 Ohio St., 568, 580.) Laches does not depend upon the number of years which have elapsed upon the accruing of rights and the assertion of them, but also upon the nature and evidence of those *526 rights, the changes in value, and other circumstances occurring during the lapse of years. (Penn Mutual Life Ins. Co. v. Austin, 168 U. S. R., 658.)
Laches is not, like limitation, a mere matter of time, but principally a question of the inequhy of presenting the claim to be enforced, an inequity founded upon some change in the condition or relation of the property of the parties. ( Galliher v. Cadwell, 145 U. S. R., 368.) The doctrine is based upon grounds of public policy, which requires for the peace of society the discouragement of stale demands. It is most applicable where the difficulty of doing entire justice arises through the death of the principal participants in the transaction complained of, or of the witnesses, or by reason of the original transaction having become so obscured by time as to render the ascertainment of the exact facts impossible. (Hammond v. Hopkins, 143 U. S. R., 224.)
While there must at some time or another be an end of accounting, and creditors of the Government must not unreasonably delay presenting their demands, and while it is true an equitable bar may sometimes arise from lapse of time in cases not strictly within any statute of limitation, it is also true that circumstances may relieve the failure to present if it does not appear that the relative position of the parties has changed. Here, it appears, the legislature of the State of Pennsylvania authorized its obligations with interest for the purposes stated in the act of 1861; the State records contain the numbers of the obligations and the amounts for which they were respectively issued, and the archives disclose possession of these evidences of debt, together with the data necessary to determine the precise sums expended. The details of the transactions are as accessible now as ever. The accounting officers of the Treasury erroneously declared, very early after similar demands were presented, that reimbursements for interest expenditures were not páyable to any State. Their action was accepted as correct by the Secretary, and his course was approved by the chief law officer of the Government. The United States lost no right and .the State gained no advantage by the nonpresentation of the claim. Under these circumstances it would be a harsh application of the rule respecting diligence to now say that the Secretary had lost jurisdiction *527 because of his erroneous decision and the inaction of the State because of that mistaken view of his authority.
Especially would such a declaration appear to be unjust and wholly technical in view of the continued presentation of claims and payment under the statute of other war claims of the State of Pennsylvania. Beginning March 1, 1862, and ending December 5, 1892, sixteen separate claims were presented by the Commonwealth, and during the time extending to March 12, 1895, the Treasury made as many as twenty-five separate payments. The intervening time from the presentation of the last allowed claim of. the State to the presentation of its final demand was something under five years. Large items in the claims already adjusted were presented twenty years or more after such items had accrued. If the unpaid claim now being considered can not be settled for want of a place of adjustment, or for staleness, or because of the bar of the period of limitation in case of suit, then some of the claims heretofore settled would seem to have been unlawfully paid.
Such a distinction in the practice of the Treasury Department in dealing with proper expenditures of plaintiff should not operate as an estoppel even though it appears the State paid its last installment of interest on its bonds in 1872. The doctrine of estoppel for failure to present — a doctrine not favored in the law — can not be invoked by the party whose officers erroneously decided presentation to be a useless proceeding. Estoppel might arise against a party where his own conduct has caused another to act differently from a course which otherwise such person might pursue without reference to a statute of limitation. It can not rest by mere silence upon a departmental ruling adverse to jurisdiction, with no additional rights acquired by a claim and no injury done to the debtor in the meantime.
The respective payments of interest were disassociated from the payments of other lawful expenditures of plaintiff. These payments were made at separate times and from funds raised by taxation. In dividing its accounts the State was excused from presenting all the claims together by the practice of the Treasury in dealing with the various expenditures.
Other questions relate to the time interest ought to be *528 allowed- — that is, treating the interest payments as principal under the decision in the New York Case, whether interest shall be allowed to maturity on the ten-year bonds of the State or to the time they were redeemed.
The method of raising money by Pennsylvania was not in the main different from that adopted bjT the State of New York,' except as to the length of time the bonds had to run. The loan on the ten-year bonds in 1861 covered a shorter period than any loan made to the State prior to 1860. Loans had been generally obtained before that time payable in from twenty-five to thirty years. The act of 1861 and the supplemental joint resolution to that act did not restrict the State in the means it should adopt to raise'the money. The United States agreed to reimburse all costs, charges, and expenses properly incurred. If long-time bonds were needlessly issued a different question' would arise, but it has not been made to appear that the credit of the State was uselessly or improvidently put forth, or that it was not the quickest sr&y of raising- money for the purposes it was immediately wanted. It does not appear that the ready cash was in the State treasury at the time.
It. is true the State might have raised the large amounts needed by direct taxation upon its citizens. In the stress of the times that may have been proper, but certainly not most expedient. It was deemed best, in the exercise of the sovereign power of the State, to raise revenue for some of its public purposes by authorizing and issuing bonds. The emergency was great, and the good faith of the State in the premises has never been, nor can ever be, questioned. Under these circumstances it can not be said that the interest expended was improper.
Besides the items of expenditure by way of interest, expenses were incurred by the State in negotiating a loan on $3,000,000 of its obligations under an act of the legislature of May 15, 1861, which authorized the State to issue bonds for the purposes named in the act of Congress. There was also expended for premiums on gold in the payment of interest on these bonds the amount shown by the report of the auditor. The expenses incurred in negotiating the loan amounted to $9,713.71 and the premiums on gold aggregated $58,303.98.
*529 The court will take judicial notice of the history of the times', of the financial conditions prevailing throughout the country, and other circumstances affecting the public credit in the efforts of the State to float its bonds. That difficulty existed in the attempt to use the credit of the State to the best advantage appears certain, and in securing the services of a fiscal agent to facilitate the negotiation of its bonds without loss and paying the sum proven to have been paid, we think the expenditure was proper. The disbursements on this account have the additional merit of being entirely reasonable.
The payment of premiums on gold were a necessity at the time. The terms of the State’s contract required specie payments. Gold was at a premium, and with the advancing storm of war continued to rise in value. The ■ authorities of the State were fortunate in not having (by mere delay) to pay more of a premium on the gold necessary to meet'the interest on the bonds of the' State as that interest fell due.
The amount of direct tax chargeable against the.State under the Act of August 5, 1861 (12 Stat. L., 295), was formerly credited in the Treasury Department some time after it became due and chargeable. Under an apportionment of this direct tax to the several States, the quota of Pennsylvania was fixed at §1,946,719.33. The balance due by the State, after deducting the 15 per cent provided by the act imposing the tax, was §1,654,711.44. There was sufficient recognition on June 30, 1862, by the United States of its liability to reimburse the State for its expenditures as to justify credit to the State of the amount of the direct tax as of the date above given. The fact that difficulties subsequently arose in the adjustment of the State’s accounts as presented in June, 1862, and that various items may have been rejected, does not prove that the United States denied its liability to the State for what was properly due to it. The controversy over the accounts related to the correctness and propriety of the disbursements and to the details of the claim as presented by the State, and not to any denial of liability for whatever was shown to be proper. For this and the reasons sot forth in the contemporaneous opinion in the case of the State of Maine, *530 the amount of direct tax should be credited as of the date stated, namely, June 30, 1862.
Summarizing- the considerations stated and directly answering the inquiries propounded by the Secretary, we hold:
■ 1. That the accounting officers have jurisdiction to entertain, adjust, and settle this claim on its merits under the decision in the case of the United States v. New York (160 U. S. R., 598).
2. That interest paid by the State of Pennsylvania lie allowed.
3. Interest should be allowed beyond the time necessary for the State to levy a tax and collect the money required for the principal expenditure.
4. This claim for interest paid out by the State on money borrowed and expended in equipping troops under the act of 1861 is not so intimately connected with the principal claims already allowed that the present claim can be held to have been settled in the adjustment of the principal claims.
5. Settlement of the claim in the Treasury is not barred by any statute of limitations, nor is it a stale claim which the accounting officers should not entertain, adjust, or settle on its merits.
6. The accounting officers having jurisdiction, the claim should be adjusted b}r allowing the State interest from the dates of the several loans made by it to raise money necessary to organize and equip troops, for which the United States promised indemnity by the act of 1861, up to the date or dates when the Government recognized the claims for the money so advanced, deducting therefrom the amount of direct tax chargeable against said State as of the date when due and chargeable to wit, June 30, 1862.
7. Under the rule stated, and by the direction of the court, the auditor to whom this case was referred to take and state the account has filed an amended report. By it the amount shown to be due is $689,442.13. This sum includes the expenses incurred in negotiating the loan and the premiums on gold, as well as the claim for interest expended. The amended report, which the court adopts as its findings of fact, is based upon the charge to the State of its quota of the direct tax and the credit of the amount of this tax as of June 30, 1862, and *531 not upon the amount claimed in the petition and credited to the State under its- contention and the auditor’s original report, at a later date.