Veronica L. CAMACHO et al.

v.

The UNITED STATES.

No. 245-68.

United States Court of Claims.

April 17, 1974.

William B. Nabors, Saipan, Mariana Islands, attorney of record, for plaintiffs.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen., Wallace H. Johnson, for defendant.

Before DAVIS, NICHOLS and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's motion, filed January 7, 1974, for judgment requesting that the court adopt, as the basis for its judgment in this case, the recommended decision of Trial Judge Philip R. Miller, filed November 14, 1973, pursuant to Rule 134(h), plaintiffs having failed to file a notice of intention to except thereto as provided by Rule 141(a) and the time for so filing pursuant to the Rules of the court having expired. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case, granting defendant's said motion for judgment. Therefore, it is concluded that plaintiffs are not entitled to recover and their petition is dismissed.

## OPINION OF TRIAL JUDGE

MILLER, Trial Judge: This is a suit for just compensation under the fifth amendment to the Constitution for the taking by the United States of two tracts of land in Saipan, Mariana Islands. Saipan is now a part of the Trust Territory of the Pacific Islands, of which the United States is trustee under a delegation from the United Nations. Joint Res. July 18, 1947, ch. 271, 61 Stat. 397. The taking is an outgrowth of events originating in World War II. The land was originally owned by Joaquin Lizama, who was killed during the invasion of Saipan by American Military Forces in 1944. Plaintiffs are his surviving children and sole heirs.

During the period between the two World Wars Saipan was governed by Japan, for most of such period under the authority of a mandate from the League of Nations. It was a source of agricultural products for Japan, primarily sugar and copra. At the start of World War II the native population numbered about 3,500. Although the Japanese imported several thousand additional civilian workers from Japan and Okinawa, the government also recognized the rights of the local people in their land and by regulation prohibited the alienation of such land to others unless approval was first obtained from the Director of the South Seas Bureau which administered such territory. However, this did not bar the expansion of a large Japanese agricultural corporation, Nanyo Kohotsu Kabushiki Kaisha (N.K.K.), which at the time of the invasion had acquired ownership of about 28 percent of the privately-owned land, and leased a great deal more.

World War II resulted in a great upheaval in the entire property structure of the island. First, to prevent the use of the island as a staging point for an attack on Japan the Japanese Military Establishment took over much of the land for purposes of fortification, airfields, ammunition and equipment storage, and the stationing of 30,000 Japanese troops. Second, the fury of the American invasion and fighting thereafter resulted in the destruction of most structures, boundaries and land records. United States Military Forces invaded Saipan on June 15, 1944 after a 4-day

bombardment. When the fighting ended, 29,000 of the 30,000 Japanese soldiers on the island were dead, as were 400 Saipanese. Almost all of the buildings and landmarks used for surveys and cadastral maps were levelled. Third, the local people were then removed from their land, confined in a relatively small fenced-in area and kept in protective custody until July 1946, a period of 2 years. They were not permitted to leave such area except under guard, for work details or other special purposes. Fourth, in preparation for the invasion of Japan practically the entire island was reconstructed with paved roads, airstrips, huge fuel and ammunition dumps, warehouses, pipelines, power lines, military quarters and training areas for up to 200,000 American troops. Hardly a square foot of the island remained undisturbed. Finally, after the conclusion of the war, the reconstruction of the island and the continued American presence necessitated retention of much of the land and structures for military and public purposes, irrespective of prewar ownership and prewar boundaries of the particular tracts.

While both the United States Military Government and the Trust Territory Government, which succeeded it in 1947 under the United Nations trusteeship, recognized the right of pre-existing private property, all of the public land office records, including the survey maps, were lost and nearly all of the individual monuments marking the corners of land parcels were missing. After the end of the war it became very difficult to reconstruct ownership of land and prewar boundaries thereof. Thus when the local people regained their freedom and new maps were drawn, it became necessary for them to file claims to ownership of individual tracts, with very few having any documents to prove ownership.

On December 29, 1947 the Deputy High Commissioner for the Trust Territory executed Trust Territory Policy Letter P–1 prescribing land policy to be followed in the administration of the territory. The policy letter reaffirmed the principle of private land ownership for the native population so that families might have means of subsistence. It stated that decisions by the prior Japanese administration as to land ownership and rights prior to Japan's resignation from the League of Nations, on March 27, 1935, would be considered binding. However, transfers thereafter to non-natives would be subject to review. They would be considered valid unless the sales were not made of free will and just compensation was not received. In the latter event title would be returned to former owners upon paying to the Trust Territory Government the amount previously received by the former owners from the transferees.

The policy letter also reaffirmed the policy of the United States to pay compensation to private owners for property required for public use. And it further stated a preference for compensating such owners by exchange of public land rather than by cash so that the citizenry not be landless.

Trust Territory Office of Land Management Regulation No. 1, originally issued January 11, 1951, provided for the filing of a claim by every person claiming an interest in land used or occupied by the United States. A title officer was authorized in each district to determine, after due notice and hearing, the ownership of any tract of land in the district used, occupied or controlled by the government and to appraise, evaluate and recommend for settlement any claim for damages resulting from the taking. Where an estate was claimed jointly or in common by the heirs of a deceased owner and where no executor or administrator had been appointed, the regulation provided for the district land officer to appoint one or more of the claimants to act as trustee or trustees for the group in connection with all matters having to do with land return and claims. However, he was forbidden to sell or otherwise dispose of land except with the approval of all parties having an interest therein or of the High Court.

Appeal from the determination of the district land title officer to the Trial Division of the High Court of the Trust Territory was authorized within one year and the latter could in its discretion hear the case de novo or on the prior record before the title officer.

The two tracts of issue herein are:

(1) Lot nos. 591, 592, 593 and 594, South District, located at Kobler Field, As Perdido, Saipan (hereinafter referred to as the As Perdido tract). The area of the property is uncertain and measures from 6.8 to 8.0 hectares.[1] This property has remained in the possession and under the control of the defendant since 1944. At some time prior to 1950 the Navy Department constructed an airfield, Kobler Field, and related buildings thereon, and the Trust Territory Government has continued to use it for such purpose.

(2) Lot no. 1387, Garapan District, Saipan, consisting of 1 hectare. This has also been in the possession and under the control of the United States since 1944. The Navy Department constructed various buildings and a paved road on the property, and the Trust Territory Government has continued to use it for the same purposes.

The plaintiffs have been aware of such occupation and usage by the defendant since it occurred, and plaintiffs have not attempted to occupy either property since 1945.

The original claims with respect to both tracts of land at issue were filed by Carmen M. Lizama, widow of Joaquin Lizama. Claim 59–A, filed January 4, 1945, covered the As Perdido property and stated that the area was about 8 cho. (A cho is a Japanese area measure equivalent to slightly less than 1 hectare.) Claim 75–A, filed January 10, 1945, covered the Garapan property, and described it as having an area of 1 cho.

Carmen having died in 1946, at some time between 1950 and 1952, Trust Territory officials called Veronica Lizama Camacho, daughter of Joaquin and Carmen, to the Land and Claims Office to question her about the claim to the As Perdido property. There, after some discussion, she executed a paper conceding that the property had previously been sold by her father to a Japanese corporation, the N.K.K. company, although her mother had not known it, and accordingly the property did not belong to the heirs of Carmen M. Lizama. At trial Veronica attempted to repudiate this statement claiming that she did not understand English and that she had only signed a small blank piece of paper without any writing on it. However, there were two witnesses to her execution of the document, Judge Gregorio T. Camacho and Henry S. Pangelinan, an official of the Land and Claims Office. Their testimony establishes that the document was typewritten before Veronica signed it and that she engaged in a half-hour's discussion with officials in the office in the Chamorro language before she executed the document.

On December 29, 1952, the Title Officer for the Saipan District filed a Determination of Ownership stating that, "after due public notice and private notice to all parties as of record, and after public hearings at which all persons claiming an interest in the [As Perdido property] were given full opportunity to be heard," he had determined that the land in question was "the property of the government of the Japanese mandated territory and is now vested in the Area Property Custodian[2] for the Trust Territory of the Pacific Islands pursuant to the vesting order dated September 27, 1951". Accordingly he released the land and gave immediate possession to the custodian. Plaintiffs failed to file any appeal from such determination of the Title Officer to the High Court within one year as permitted by Regulation No. 1.

On July 16, 1953, the same title officer issued the determination that the

---

1. One hectare equals 10,000 square meters or approximately 2.43 acres.

2. Now Alien Property Custodian. 27 Trust Territory Code § 2 (1970).

Garapan property, consisting of 1 hectare, was "the property of the heirs of Joaquin Lizama represented by Jose M. Lizama as land trustee", but he denied them possession because the land was part of a United States retention area. Following such determination of ownership, on December 30, 1954, Jose M. Lizama on behalf of the heirs of Joaquin Lizama, deceased, as land trustee, entered into a written agreement with the Trust Territory Government for the exchange of the Garapan property for other public property. It is not clear from the record whether Jose's delegation by the other heirs to act as land trustee on their behalf in the presentation of the claim was sufficient to authorize his entering into the exchange agreement.

Pursuant to the exchange agreement, on February 5, 1958, the Trust Territory Government tendered deeds to the heirs of Joaquin Lizama represented by Jose Lizama, but he refused to accept such deeds and both he and the other heirs refused to execute a quit claim deed for the Garapan property. Jose's explanation for such refusal was that the deeds tendered him were not in accordance with his oral agreement with the representative of the Trust Territory Government. He understood he was to receive a larger tract for himself and that each of the other heirs was to receive an individual house lot. He claimed that the written agreement did not reflect the oral understanding, that he did not understand English and that the written agreement was not translated.

On June 29, 1966 plaintiffs brought two suits in the Trial Division of the High Court of the Trust Territory, entitled, Jose M. Lizama, et al., Plaintiffs v. Elias P. Sablan, District Land Title Officer, Defendant, Civil Action Nos. 174 and 175, invoking the original jurisdiction of such court to try all causes involving the adjudication of title to land. In the first action plaintiffs claimed both compensation and return of the As Perdido property stating that they had claimed such property from the Trust Territory Government in 1954, without success. In the second action plaintiffs made similar claim with respect to the Garapan property. In both, the defendant moved to dismiss with prejudice because (a) the court lacked jurisdiction of the suit, no appeal having been taken from the title determination; (b) plaintiffs had failed to join an indispensable party, the government of the Trust Territory, which had not consented to be sued; (c) an appeal from the title determination was barred by the 1-year limitation period prescribed by Land Management Regulation No. 1 in each case; and (d) the complaint lacked certainty in that it failed to describe the land. In addition, the defendant contended that the first suit should be dismissed because the plaintiffs' father had sold the property in 1938 to a Japanese corporation, and the second suit should be dismissed because the plaintiffs had agreed to exchange the land for other land. After oral argument, on October 31, 1966, the High Court entered orders dismissing both suits without prejudice and without opinion. Plaintiffs filed no appeal to the Appellate Division of the High Court.

Plaintiffs contend that the determination of the land title officer in 1952 that the As Perdido property was owned by a Japanese corporation (and hence was vested in the Alien Property Custodian) was invalid because notice of hearings on plaintiffs' claims had not been given to the plaintiffs, in violation of Land Management Regulation No. 1. They also assert that there is doubt as to whether the sale by plaintiffs' father to the Japanese corporation in 1938 had actually taken place; that if it occurred, it may only have involved a part of the tract; and that the consideration paid by the Japanese corporation was inadequate.

With respect to the Garapan property plaintiffs contend that the 1954 exchange agreement between Jose Lizama and the Trust Territory Government is null and void because they did not consent to the exchange, and that such con-

sent is required under Land Management Regulation No. 1.

Defendant does not challenge the plaintiffs' position that the United States Constitution guarantees just compensation to an alien for the taking of property in a foreign country. This was decided as a matter of first impression in Turney v. United States, 115 F.Supp. 457, 464, 126 Ct.Cl. 202, 215 (1953), and adverted to in Seery v. United States, 127 F.Supp. 601, 603, 130 Ct.Cl. 481, 483–484 (1955) (involving foreign property of an American citizen). Nor for purposes of this case does defendant question whether the Constitution requires compensation for the post-hostilities failure to return foreign property taken from aliens in enemy territory during a war, although the matter may not be wholly free from doubt.[3] However, under the view we take of this case, that plaintiffs are not entitled to recover in any event, it is unnecessary to decide such question.

Defendant urges primarily that this action is barred by the statute of limitations, 28 U.S.C. § 2501, since both properties at issue were taken by the United States more than 6 years before suit was filed. Second, defendant contends plaintiffs are collaterally estopped by the 1966 decisions of the High Court of the Trust Territory which they failed to appeal to the Appellate Division of the High Court. Third, defendant asserts, plaintiffs were not in fact the owners of the As Perdido property, since their father had sold it to the Japanese corporation in 1938. And, fourth, defendant avers, plaintiffs' claim to compensation for the Garapan property was satisfied by the exchange agreement and plaintiffs have simply refused to accept the substitute land.

■ It is decided herein that plaintiffs' petition must be dismissed because it is barred by the statute of limitations. Title 28 U.S.C. § 2501 provides in pertinent part: "Every claim of which the Court of Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." This requirement is jurisdictional and cannot be waived by the United States. United States v. Wardwell, 172 U.S. 48, 19 S.Ct. 86, 43 L.Ed. 360 (1898); Finn v. United States, 123 U.S. 227, 8 S.Ct. 82, 31 L.Ed. 128 (1887); Nager Electric Co. v. United States, 368 F.2d 847, 857, 177 Ct.Cl. 234, 249 (1966).

■ The petition in this case was filed August 27, 1968. Both properties at issue were taken by defendant prior to 1945 and have been occupied by it and by the Trust Territory Government continuously since that time. The As Perdido property has had an airfield on it in continuous use since prior to 1950, and the Garapan property has had a paved road and various buildings thereon, constructed by the Navy Department some time prior to 1951. Plaintiffs have been aware of such appropriation at all times and have made no effort to occupy either property since 1945.

Plaintiffs claim the statutory period did not begin to run until 1966, because they received no formal notice of determination from the Land and Claims Office until 1966, that they had no attorney before then, and were ignorant of their right to bring suit in this court; but such arguments are insufficient to avoid the bar of limitations.

■ First, if they did not receive fair or procedurally proper administrative treatment, their remedy was to appeal within one year from the administrative determinations to the Trial Division of the Trust Territory High Court, as provided in Trust Territory Office of

---

3. *Cf.* Juragua Iron Co. v. United States, 212 U.S. 297, 306, 29 S.Ct. 385, 53 L.Ed. 520 (1909); United States v. Caltex, Inc., 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952); Pauly v. United States, 152 Ct.Cl. 838 (1961); Aris Gloves, Inc. v. United States, 420 F.2d 1386, 190 Ct.Cl. 367 (1970); Seery v. United States, *supra*, and Cuban Truck and Equipment Co. v. United States, 333 F. 2d 873, 166 Ct.Cl. 381 (1964), cert. denied, 382 U.S. 844, 86 S.Ct. 65, 15 L.Ed.2d 85 (1965).

Land Management Regulation No. 1, which had the power to hear the case de novo.[4] If there was proper basis for tolling the limitation provision on appeal, plaintiffs could have asserted such grounds in the Trial Division of the High Court and, if necessary, appealed therefrom to the Appellate Division of the High Court.[5] However, when plaintiffs' 1966 suits against the district land title officer were dismissed without prejudice by the Trial Division, at a time when plaintiffs did have counsel, they discontinued any further proceedings in that court. This court does not, of course, have appellate review jurisdiction over the High Court of the Trust Territory.

■ Second, assuming the claims to just compensation are cognizable under the United States Constitution and provide an independent basis for suit in this court, the administrative proceedings before the Trust Territory Government have not been made a prerequisite to such suit and hence do not toll the statute of limitations for bringing it. In creating the Court of Claims Congress restricted the court's jurisdiction to suits wherein the petition is filed within 6 years after such claims *first accrue*. Soriano v. United States, 352 U.S. 270, 273, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957). Where the filing of an administrative claim or other proceeding is not made a statutory prerequisite to suit but is only permissive, the statute of limitations is not tolled by the pendency of such a claim. Soriano v. United States, supra; Crown Coat Front Co. v. United States, 386 U.S. 503, 519, 87 S. Ct. 1177, 18 L.Ed.2d 256 (1967); Friedman v. United States, 310 F.2d 381, 159 Ct.Cl. 1 (1962), cert. denied, sub nom., Lipp v. United States, 373 U.S. 932, 83

S.Ct. 1540, 10 L.Ed.2d 691 (1963); Steel Improvement Co. v. United States, 355 F.2d 627, 174 Ct.Cl. 24 (1966).

In Soriano v. United States, *supra*, plaintiff, a resident of the Philippines, brought suit in the Court of Claims to recover just compensation for the requisitioning by Philippine guerilla forces of food, equipment and supplies during the Japanese occupation of the Philippine Islands. The suit was filed in April 1951, more than 6 years after the last requisition in January 1945. The petitioner contended, however, that the suit was timely because he was first required to present his claim to the Army Claims Service and such administrative procedure was not exhausted until 1948. The Supreme Court ruled, however (352 U.S. at 274–275, 77 S.Ct. at 272):

Petitioner asserts that his action did not accrue until the denial of the claim by the Army Claims Service. * * * Petitioner would have us hold that this just compensation case could not be filed until after an administrative denial of his claim filed with the Army Claims Service. But * * * Congress has made no such requirement. It has not so restricted the jurisdiction of the Court of Claims.[6] Under the circumstances, for us to say that the exhaustion of administrative remedies in such case is a prerequisite to the jurisdiction of the Court of Claims would but "engraft [another] disability upon the statute" and thus frustrate the purpose of Congress. Furthermore, it would be a limitless extension of the period of limitation that Congress expressly provided for the prosecution of claims against the Government in the Court of Claims. This we cannot do. [Footnote omitted.]

4. *Cf*. 67 Trust Territory Code § 115 (1970) (1966 ed., § 1039). *And see* Rivera v. Trust Territory, 4 Trust Territory Reports 140 (1968), which outlines the relief available in the High Court in cases presenting such issues, and Sechelong v. Trust Territory, 2 T. T.R. 526 (1964).

5. *Ibid. And see* Ngodrii v. Trust Territory, 2 T.T.R. 142 (1960) for a case in which the limitations provision in Office of Land Management Regulation No. 1 was tolled.

■■ Plaintiffs' argument that they were ignorant of their rights and lacked legal counsel is also insufficient to toll the statute of limitations for suit in this court. A similar argument was considered in the case of Japanese War Notes Claimants Ass'n v. United States, 373 F.2d 356, 359, 178 Ct.Cl. 630, 634–635, cert. denied, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967). There the plaintiffs brought suit in 1964 to recover reimbursement for losses from counterfeit Japanese military currency distributed in the Philippine Islands by United States military intelligence agents during the Japanese occupation between 1942 and 1945. Plaintiffs claimed that they were ignorant of their rights and lacked knowledge of the circumstances during most of the intervening years. The court held however that "Ignorance of rights which should be known is not enough" to toll the statute of limitations, and "Plaintiff must either show that defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date." Congress has not provided for tolling the statute of limitations because a claimant has not had counsel. *See* Andrade and Pitt River Tribe v. United States, 485 F.2d 660, 664, 202 Ct.Cl. 988, 997 (1973). To create such an exception would be to allow claims on behalf of one group of claimants to remain open indefinitely. This would tend to frustrate one of the prime objectives of the statute of limitations, "to prevent factual issues from being tried too long after the events occurred —with witnesses dead or gone, records lost or destroyed, and memories confused or dimmed—at a time when the past cannot be reconstructed with any pretense of accuracy." Friedman v. United States, *supra*, 310 F.2d at 401, 159 Ct.Cl. at 34.

There is accordingly no need to resolve most of the other contentions and defenses raised by the parties concerning the administrative proceedings before the Trust Territory Government.

However, with respect to the merits of the As Perdido property claim it must be observed that this issue having been fully tried before this court the evidence is persuasive that Joaquin Lizama had indeed sold the As Perdido property to the Japanese N.K.K. corporation in 1938, and therefore his heirs did not own such property at the time of its taking thereafter. As shown in greater detail in findings 16 and 19, this is borne out by photographic copies of the original records incident to the sale, containing Joaquin's stamp or signature, which were found in N.K.K.'s files.

Plaintiffs claim in their brief that "[a] great deal of doubt exists as to whether the purported sale of the farm at As Perdido was in fact a legal transaction." A principal element of that contention is the evidence that Fritz Lizama, Joaquin's son (also killed in the war), whose signature and stamp appear on the sales agreement as a witness to his father's signature on the November 4, 1937 sales agreement, left Saipan in 1936 to go to Ponape and did not return until some time in the year 1938. But this is not sufficient to prove the entire sale was a fabrication. That would necessitate the conclusion that a number of other documents in Japanese and Chamorro were also fabricated: A survey map incident to the sales agreement; the joint application by Joaquin and N.K.K., dated November 9, 1937, for approval of the sale by the Director of the South Seas Bureau; the director's approval, dated October 7, 1938; the letter, dated October 20, 1938, from the Saipan Branch Office of the South Seas Government transmitting such approval; and the joint letter from Joaquin and N.K.K. to the Saipan Branch Office, dated November 2, 1938, requesting registration of the transfer. This seems highly improbable. It is much more likely that the recollections of the witnesses as to when Fritz left Saipan or whether he returned for a visit are faulty after many years. It may also be, as plaintiffs' counsel himself sug-

gested at trial, that the agreement could have been sent to Fritz for execution in Ponape. And, still further, Fritz could have executed his attestation as a witness to his father's signature upon his return to Saipan during the first half of 1938.

Plaintiffs also offered testimony that one Jose Cruz, a cousin of their father, continued to work on the farm during 1938. But in view of the fact that the transfer of the farm was not completed until November 1938, this evidence is not inconsistent with the fact of a sale.

Next, plaintiffs contend that the documents of conveyance "may or may not be authentic" because signature stamps could easily be made for 50 cents. But the documents were admitted in evidence without objection, and plaintiffs' counsel conceded at trial that he had no direct evidence that the signatures and stamps were not that of Joaquin. Mere speculation that the execution might have been forged is not a substitute for proof. Moreover, plaintiffs' witness, Benigno O. Sablan, who testified as to the cost of the signature stamps, repudiated such speculation, stating that stamps had to be approved by government officials, that forgery could never happen and that the use of an unauthorized stamp would have resulted in imprisonment.

Finally, plaintiffs imply that the Japanese may have exercised coercion against Joaquin and they state that there is a question as to the adequacy of the compensation. But plaintiffs' counsel conceded at trial that he had no evidence of coercion with respect to the 1938 transaction and he did not offer any testimony that the ¥3,224 (then worth about $806) was not a fair price for the land in 1938.

Thus even if their suit were not barred by the statute of limitations, the evidence adduced by the parties at trial shows that plaintiffs are not entitled to recover on the merits with respect to the major part thereof.